# UNITED STATES DISTRICT COURT
for the
## DISTRICT OF NEW HAMPSHIRE

Nicholas Champagne,
David Coulombe,
Palacio Paladin, and
Richard West,
               Plaintiffs,

v.                                                                          Civil No.   05-CV-___-___

Cesar Rivas, individually,
Carl Brown, individually,
David Gotthardt, individually,                        Plaintiff Demands a Jury Trial
Russell Hartley, individually,
Ryan LeVierge, individually,
Brian Martineau, individually,
James O'Mara, Jr.,  individually and as
      Superintendent of the Hillsborough
      County Department of Corrections,
Terry Pendleton, individually,
William Raymond, individually,
Jason Riley, individually,
William Scurry, individually,
John Sullivan, individually,
Gerald Uber, individually, and
Vincent Williams, individually,
               Defendants.

## Complaint for Damages and Declaratory Relief

### Introduction.

_____Plaintiffs are former pre-trial detainees of the Hillsborough County House of Corrections

(hereinafter "the jail") who bring this action pursuant to 42 U.S.C. §1983 alleging defendants

violated their rights under the Eighth and/or Fourteenth Amendments in that defendants filed

false disciplinary charges against plaintiffs, physically assaulted and beat plaintiffs, subjected

plaintiffs to an unfair disciplinary process, unlawfully kept plaintiffs in the maximum security

unit of the jail, and subjected plaintiffs to inhumane and otherwise illegal conditions while in the maximum security unit of the jail. Plaintiffs seek compensatory and punitive damages, and declaratory relief.

**Parties**.

      **Plaintiffs.**

1.      Plaintiff Nicholas Champagne is a resident of the New Hampshire State Prison, North State Street, Concord, New Hampshire. From about December 2001 through August 2, 2002, Champagne resided at the jail, at all times as a pretrial detainee.

2.      Plaintiff David Coulombe is a resident of the New Hampshire State Prison, North State Street, Concord, New Hampshire. From about October 2001 through October 16, 2002, Coulombe resided at the jail as a pretrial detainee until September 23, 2002, and as a sentenced inmate from September 23 until his October 16 transfer to the state prison.

3.      Plaintiff Patricio Paladin is a resident of West 3rd Street, Lowell, Massachusetts. From about March 2002 until about December 23, 2002, Paladin resided at the jail, at all times as a pretrial detainee.

4.      Plaintiff Richard West is a resident of Dubuque Street, Manchester, New Hampshire. From June 2002 through October 2002, West resided at the jail on an alleged probation violation and, therefore, was the same as a pretrial detainee throughout his stay at the jail.

      **Defendants.**

5.      Defendant Cesar Rivas, was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under

2

color of law.  He is sued in his individual capacity.

6.        Defendant Carl Brown was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

7.        Defendant David Gotthardt was at all relevant times a sergeant employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

8.        Defendant Russell Hartley was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections.  Hartley served on the "classification committee."  He is sued in his individual capacity.

9.        Defendant Ryan LeVierge was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

10.        Defendant Brian Martineau was at all relevant times a Lieutenant employed by the  Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

11.        Defendant James O'Mara was at all relevant times the Superintendent of the Hillsborough County Department of Corrections.  He is sued in his individual and official capacities.

12.        Defendant Terry Pendleton was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections, serving as a hearing officer in cases of inmate discipline, and at all relevant times acted under color of law.  She is sued

in her individual capacity.

13.       Defendant William Raymond at all relevant times served as the classifications supervisor, employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

14.       Defendant Jason Riley was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

15.       Defendant William Scurry was at all relevant times a lieutenant employed by the Hillsborough County Department of Corrections and served as a hearing officer in cases of inmate discipline, and at all relevant times acted under color of law.  He is sued in his individual capacity.

16.       Defendant John Sullivan was at all relevant times a lieutenant employed by the Hillsborough County Department of Corrections.  Sullivan was, on information and belief, sat on the "classification committee."  At all relevant times Sullivan acted under color of law.  He is sued in his individual capacity.

17.       Defendant Gerald Uber was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

18.       Defendant Vincent Williams was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

**Jurisdiction and Venue.**

19.         This court has jurisdiction pursuant to 28 U.S.C. §§1331(a) and 1343(3) because this suit arises out of the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

20.         Venue is proper in this district because all records relevant to this action are located in New Hampshire, most parties reside or work in New Hampshire, and all the acts and omissions complained of in this case occurred in New Hampshire.

**Facts.**

**Defendant Rivas's "10-33" call.**

21.         As of July 14, 2002, all plaintiffs were held in the "upper tier," or second floor, of Unit 2D at the jail and thus received their "tier time," or time out of their cells, together. Their cell doors opened to a walkway/balcony which overlooked the unit's common area.

22.         As of July 14, 2002, one corrections officer was assigned to Unit 2D at a time. That officer operated the locking mechanisms for all the cell doors from a control panel located in the unit's common area and from which the officer could see all the cell doors arrayed in two floors on the other side of the common area.

23.         During the evening shift on July 14, 2002, the officer assigned to Unit 2D was defendant Rivas.

24.         At about the time that plaintiffs' cell doors were to be unlocked for their evening tier time, Rivas did so and plaintiffs commenced the activities allowed them during tier time -- showers, weight lifting, access to the outside basketball court, and moving about the unit's common area.

25.         Plaintiff West decided to take a shower.  West left his cell, walked down the stairs, across the common area and toward the showers, located at one end of the common area.  As he walked toward the showers, he approached Rivas to ask Rivas why he and Rivas were not getting along.  West had been at the jail only a couple of weeks during which time West and Rivas had several disagreements.

26.         During the course of this conversation, West did not verbally or physically threaten Rivas, no other inmates took part in the conversation, nor did an unusual number of other inmates gather around Rivas and West (there were often inmates waiting to see the officer for things such as copies of requests slips or the like).

27.         After a few moments of conversation, and still with no threatening nor provocative behavior by West nor any other inmate, Rivas turned his head toward his radio microphone attached near his shoulder and said into the handset "10-33," which was heard on all radios throughout the jail, and then Rivas began yelling "10-33, "lock it down," or words to that effect for all the inmates in Unit 2D to hear.

28.         The phrase "10-33" is a radio code that expresses nearly the highest level of emergency.  It is the code used to tell the rest of the jail that an officer is "in need of assistance."  (Only a "10-34," meaning "officer down," is more serious.)  A "10-33" is most often called when a fight breaks out between inmates or when there is a medical emergency.  Upon hearing "10-33" every available officer is to rush to that unit and all inmates are to rush to their cells -- or even someone else's cell -- because the doors will be locked forthwith and inmates caught outside after a "10-33" are subject to discipline.

29.         When Rivas called "10-33," West's first reaction was to turn around to see if a

fight broke out behind him.  There was none.  West had no idea why Rivas called the 10-33, but nonetheless hurried back to his cell, number 2200.

30.        When plaintiff Champagne heard the 10-33, he was on the telephone trying to call his girlfriend.  Champagne hung up and rushed to his cell, number 2299.  Champagne's cell mate was locked in their cell during tier time for punishment, so Champagne went into another cell.

31.        Plaintiff Coulombe did not hear the 10-33 because he was outside playing basketball.  Coulombe just finished a game and opened the door to the common area to go to the bathroom.  Coulombe saw the other inmates running to their cells, heard the order to "lock down," and immediately went to his cell, number 2290.

32.        Plaintiff Paladin was playing basketball with Coulombe and others when Rivas called the 10-33 and thus did not hear it.  After finishing his game, Paladin left the yard, walked into the common area, and saw the other inmates running to their cells, so Paladin did the same, his cell being number 2297.

**Unit 2B.**

33.        Unit 2B is physically arranged the same as the jail's other units, but is administratively divided so that it contains at least three categories of cells, and thus at least three categories of inmates within those cells.

34.        First, Unit 2B contains cells designated the "Restricted Housing Unit," or RHU, which holds inmates and detainees who have been found guilty of internal jail disciplinary offenses and have been sentenced to a period of time in solitary confinement as punishment.  RHU is sometimes referred to as "the hole."

35.     Second, Unit 2B contains cells designated for maximum security inmates, a designation not relevant to this lawsuit.

36.     Third, Unit 2B contains cells to hold those inmates in "awaiting hearing" status. These are inmates who have been charge d with, but not yet adjudicated on, charges of violating jail rules.

**Plaintiffs are "lugged" to "the hole."**

37.     On July 14, 2002, after plaintiffs and the other inmates were locked in their cells and other officers arrived on the unit in response to Rivas's 10-33 call, Rivas began identifying to the other officers the inmates who Rivas was falsely accusing of trying to take Rivas hostage and falsely accusing of violating other jail rules.  No other officers were present on Unit 2D when Rivas called the 10-33.

38.     Rivas knew that making these false statements to the other officers about plaintiffs' alleged misconduct would result in the removal of plaintiffs from their cells to the punitive section of the jail, or Unit 2B.  In jail lingo, Rivas knew his false accusations would result in plaintiffs being "lugged" to "the hole."

39.     Indeed, it was Rivas's intent in making the false accusations to have plaintiffs removed from Unit 2D.

40.     The other officers acting at least in part on Rivas's false accusations began removing plaintiffs from their cells in Unit 2D to Unit 2B.

41.     At the time plaintiffs and other detainees were removed from Unit 2D as described below, none of them knew why.  No one saw any misconduct toward Rivas to cause the 10-33, because there was none, no one saw any other reason for the 10-33 such

as a fight, and no one told plaintiffs until nearly 5 to 10 days later the reason they were being lugged.

42.        Plaintiff West was the first to be removed.  Defendants Riley and/or Brown instructed West to kneel at the back of the cell, face toward the wall and put his hands on the wall above his head.  West complied.  Riley and Brown entered the cell, placed shackles on West's ankles, cinched the shackles unreasonably tight, then handcuffed West's hands behind his back, again making the handcuffs unreasonably tight.

43.        After West was cuffed and shackled, Brown grabbed West's leg and/or shackles and pulled violently backward, causing West's face to strike the wall and/or floor. Brown and Riley lifted West, who was face down on the cell floor, by the handcuffs and shackles, hoisted West up, and carried West to Unit 2B.

44.        It is necessary to pass through heavy metal doors in order to leave Unit 2D and upon entry to Unit 2B.  Brown and Riley violently used West's head as a battering ram of sorts to open these doors.

45.        At no time during the removal of West from his cell and being transported to Unit 2B did West provoke violence nor did he offer any resistance.

46.        Upon arrival at Unit 2B, Brown and Riley dumped West on a bunk and left him there, still handcuffed and shackled.

47.        As a result of the violent treatment as described above, West suffered a broken wrist, severe bruises to his ankles and wrists, and bruises and abrasions on his face and body.

48.        Antonio King was the second detainee to be removed from his cell.

49.        Anselmo Palacio was the third inmate to be removed.

50.        Plaintiff Champagne was fourth.  Champagne was removed by defendants LaVerge and Riley.  During Champagne's removal, LaVerge kneed Champagne in the head, placed the shackles and handcuffs unreasonably tight and dragged Champagne to Unit 2B.  LaVerge and Riley violently used Champagne's head to open the unit doors.

51.        Defendant Sgt. Gotthardt was present for, observed, supervised, and encouraged and or condoned the above conduct of Riley and LaVerge as they assaulted and transported Champagne.

52.        At no time during the removal of Champagne from his cell and being transported to Unit 2B did Champagne provoke violence from nor did he offer any resistance.

53.        Inmate Warren Waterman was the fifth to be removed.

54.        Plaintiff Paladin was the sixth to be removed.  Defendants Brown and Uber removed Paladin.  Paladin assumed the kneeling position against the wall, his back to the officers, his hands above his head on the wall.  First, Paladin's face was pushed up against the wall, then Brown and/or Uber handcuffed Paladin with unreasonable force, pulling Paladin's arms backwards, yanking on his arms, making the handcuffs and shackles unreasonably tight.  Once handcuffed, Paladin was lifted by his handcuffs and had his face pushed against the wall a second time.  Brown and Uber violently used Paladin's head to open the unit doors.  As Paladin was dragged/walked to Unit 2B, Brown and Uber continuously twisted Paladin's wrists and arms.  Brown and Uber dropped Paladin into the cell in Unit 2B, removed the handcuffs and shackles, then had Paladin submit to an unreasonably long strip search, leaving Paladin naked for 5 - 10

minutes, taunting Paladin with statements such as, "don't you mess with one of us," meaning Rivas.

55.     Defendant Sgt. Gotthardt was present for, observed, supervised, and encouraged and or condoned the above conduct of Brown and Uber as they assaulted and transported Paladin.

56.     At no time during the removal of Paladin from his cell and being transported to Unit 2B did Paladin provoke violence nor did he offer any resistance.

57.     Surprenant was the seventh to be lugged.

58.     Baker was the eighth person removed from his cell.

59.     Plaintiff Coulombe was the ninth and last person removed from Unit 2D. Defendant LeVierge ordered Coulombe to kneel at the back of his cell, face to the wall, hands up with palms facing backward.  Coulombe complied.  LeVierge entered the cell, grabbed Coulombe's legs and pulled them backward, causing Coulombe's face to strike the cell floor.  LaVerge kneed Coulombe in the head while Coulombe was prone. LeVierge and defendant Williams picked Coulombe up by his handcuffs striking Coulombe's head on a desk in the cell, and used Coulombe's head to open the metal door as they left Unit 2D.  After leaving Unit 2D, LeVierge and Williams turned Coulombe around and made him walk backwards, while handcuffed and shackled, all the way to Unit 2B, up the stairs within Unit 2B and into Coulombe's new cell.  LeVierge and Williams threw Coulombe on the floor, and struck Coulombe a few more times.

60.     Defendant Lt. Martineau was present for, observed, supervised, and encouraged and or condoned the above conduct of Williams and LeVierge as they assaulted and

transported Coulombe.

61.         At no time during the removal of Coulombe from his cell and being transported to Unit 2B did Coulombe provoke violence nor did he offer any resistance.

**"The Hole."**

62.         Plaintiffs and the other inmates removed from Unit 2D were housed in Unit 2B one person per cell.  From July 14, 2002, the evening plaintiffs were lugged to Unit 2B, until about the middle of September, 2002, when the 30 day Unit 2B sentence imposed on all plaintiffs expired, see below, all plaintiffs (save Champagne who left the jail on August 2) were subjected to inhumane and illegal conditions including, but not limited to, the following:

A.         Plaintiffs were on "3-day rotation," which means plaintiffs were taken out of their cells for one five-minute period every three days.  That five minute period always occurred during the night, and was used only to give plaintiffs a shower.

B.         During each plaintiff's five minute period, each plaintiff was escorted, naked and with handcuffs and shackles, to the shower.  The handcuffs and shackles were not removed during the shower, then plaintiffs were returned to their cells for the next three days.

C.          Inside their cells, plaintiffs had no television, no radio, no reading material of any kind, no writing material of any kind, no access to their legal papers, no soap, no toothpaste, no toothbrushes and no toilet paper.  Plaintiff literally had nothing.

D.         Plaintiffs had to ask for toilet paper when needed.  In response to these

requests, sometimes plaintiffs would receive no toilet paper, and often they would receive an insufficient amount of toilet paper.

E.        Plaintiffs had no access to the telephone.

F.        Plaintiffs had no visits.

G.        Plaintiffs had no access to mail, neither incoming nor outgoing.

H.        Plaintiffs had no access to their attorneys by phone, by mail, nor in person.

I.        The water in the Unit 2B cells for flushing toilets, for washing and for drinking, can be controlled by the officers from a control panel outside each cell's door. The water to all plaintiffs was turned off, requiring plaintiffs to ask for water to be turned on to flush their toilets, to wash and to drink. Often, the officers on duty would refuse to turn the water on for long periods of time, resulting in plaintiffs living and eating in close proximity to their excrement, having to eat with dirty hands, and going without water to drink.

J.        Plaintiffs were strip searched several times a day, which searches required plaintiffs to spread their buttocks and lift their genitals so the officer could see those areas, then plaintiffs had to put their hands into their mouths so that the searching officer could look there as well.

K.        Plaintiffs were not allowed access to buy items from the "canteen," an in-house convenience mart of sorts, from which inmates can supplement the food served by the jail.

63.        These illegal conditions continued for several weeks after the July 14 incidents, after which time the conditions improved slightly, so that the plaintiffs who remained in

the jail were allowed out of their cell for 30-40 minutes per day, were allowed limited phone and mail access, and allowed limited writing materials and documents in their cells.

64.     Throughout the time plaintiffs were held in Unit 2B, many officers passed through that unit, including sergeants, lieutenants and captains.  All these employees were aware of the conditions under which plaintiffs were being held.  Official defendant O'Mara thus knew, or reasonably should have known, that plaintiffs were being subjected to such inhumane conditions, yet did little to nothing to cure the situation. Therefore, plaintiffs allege that it was the policy and custom of the jail, and thus of official defendant O'Mara, to detain people confined to Unit 2B, including plaintiffs, under such unconstitutional conditions as described above.

**The Hearing Process.**

65.      Plaintiffs were not notified of the reason for being lugged from Unit 2D to Unit 2B for 5 to 10 days after July 14, 2002.  The notification occurred when an officer came to each plaintiff's cell with a document and read to each plaintiff what each was being charged with, which charges included an attempt to take an officer hostage.  Some plaintiffs were not notified of the charges until they were taken to their "hearing" at which time the charges were read.  Plaintiffs were not given a copy of the charges then.

66.     Each plaintiff received a disciplinary hearing approximately two to four weeks after July 14, 2002 (not all hearings were held on the same day).  Defendant Pendleton presided at every hearing.  In addition, defendant Scurry participated in the hearings of plaintiffs Coulombe and West.

67.     Plaintiffs were not afforded due process at the hearings.  Plaintiffs were not given

sufficient notice of the charges against them, were not allowed to call witness at the

hearing, were not provided the means to call witnesses nor to request evidence in their

defense, were not given the opportunity to cross examine their accusers, were not

provided any information generated by the jail's alleged investigation, were not given

written reasons for the adverse findings and were denied any meaningful appeal.

68.     Defendant Pendleton, and defendant Scurry for the hearings he attended, only asked

plaintiffs what happened and, after hearing plaintiffs' narrative as outlined above, closed

the "hearing" without rendering a decision.  Plaintiffs were individually notified from a

few days to a few weeks later that they were found guilty of the charges and sentenced to

30 days in punitive segregation, or RHU.

69.     Plaintiffs were not given credit for the time already spent in Unit 2B awaiting the

hearing, approximately 25 days, and thus commenced serving the new 30 day sentence

after the hearing.

70.     As to an appeal, plaintiffs were given no instructions nor forms to complete to

perfect their appeal, nor were they provided another opportunity to present evidence or

argument in support of their appeal.  Some plaintiffs were simply informed that the

appeal would be "taken care of."  On information and belief, O'Mara was the appeals

officer and, on information and belief, O'Mara denied all of plaintiffs' appeals without

any meaningful review of the facts and circumstances of each particular case, and

O'Mara knew or should have known that his appellate review was unsatisfactory. and

that the sentences imposed were unlawful as each plaintiff had already served most of the

imposed sentence.

71.        After each plaintiff served his respective 30 day Unit 2B sentence, each was entitled to appear before a classification committee to determine whether and when he would be allowed to return to a less restrictive unit (except for plaintiff Champagne who left the jail prior to the expiration of his Unit 2B "sentence").

72.        If one who completed his 30 day sentence was not returned to the general population, on information and belief, his status changed to "administrative segregation." On information and belief, there are policies and customs governing the designation of inmates to and from "ad-seg" status.

73.        On information and belief, defendants Hartley, Raymond and Sullivan comprised the Classification Committee that reviewed each plaintiff or were responsible to conduct such review for those plaintiffs who were not reviewed.

74.        No plaintiff received a favorable order from the Classification Committee, and thus every plaintiff remained in solitary confinement on "ad seg" status until he left the jail.

75.        On information and belief, the determinative reasons the Classification Committee used to deny plaintiffs a return to general population were the false allegations of Rivas from July 14 and the related events of July 14, despite the fact that each plaintiff (save Champagne) had already served in excess of the 30 day punishment assessed for those same alleged offenses and despite the fact that the jail's own internal investigation should have concluded that Rivas's attempted kidnaping allegations were false.

76.     On information and belief, no other constitutionally sufficient reason was given nor existed to justify keeping plaintiffs on "ad-seg" status.

77.     Plaintiff Champagne left Unit 2B and the jail on August 2, 2002, upon receiving a state prison sentence.

78.     Plaintiff Coulombe left Unit 2B and the jail on October 16, 2002, upon receiving a state prison sentence.  Coulombe remained in Unit 2B without just cause after expiration of the 30-day sentence until his transfer to state prison.

79.     Plaintiff Paladin left Unit 2B and the jail in late December 2002, upon being transferred to the state prison.  Paladin remained in Unit 2B without just cause after expiration of the 30-day sentence until his transfer to state prison.

80.     Plaintiff West was released from Unit 2B and the jail in October 2002.  West remained in Unit 2B without just cause after expiration of the 30-day sentence until his release.

Count I
(false accusations by Rivas - due process violation)

81.     Plaintiffs incorporate paragraphs 1 though 80 as though stated here.

82.     It is a violation of plaintiffs' due process rights for agents of the state to knowingly make false accusations of misconduct that can give rise to criminal and/or internal prosecution.

83.     Defendant Rivas violated plaintiffs' due process rights by falsely accusing them of, *inter alia*, attempting to take him hostage.

84.     Defendant Rivas made these false accusations knowing that it would result in plaintiffs being "lugged" to Unit 2B, knowing that plaintiffs may be physically harmed

while being lugged, and knowing that plaintiffs would receive severe punishment through the jail's disciplinary process and the resulting time in "the hole."

85.     As a direct and proximate result of Rivas's false accusations, plaintiffs suffered harm which harm includes, but is not limited to, plaintiffs' forcible removal from their cells and violent transportation to Unit 2B and the physical and emotional harms such conduct caused, receipt of internal disciplinary charges, guilty findings on those charges, and receipt of punishment to include substantial time in Unit 2B and the inhumane conditions experienced in Unit 2B.

Count II
(physical abuse by Brown, Gotthardt, LeVierge,  Martineau, Riley,
Uber, Williams - due process violation)

86.     Plaintiffs incorporate paragraphs 1 through 85 as though stated here.

87.     Plaintiffs, as pre-trial detainees, are protected by the Fourteenth Amendment from the excessive use of force that amounts to punishment.

88.     As described above, defendants Brown, LaVerge, Riley, Uber and Williams used excessive force in removing plaintiffs from their cells in Unit 2D and transporting them to Unit 2B.  There was no need for the use of force as plaintiffs did not provoke force nor did they offer any resistance to the officers' demands.  Severe injuries were inflicted upon plaintiffs. The use of force was applied to impose punishment and/or was applied maliciously and sadistically for the very purpose of inflicting harm.  Such force amounts to constitutional violations.

89.     Defendants Gotthardt and Martineau were supervisors actually present and supervising the beatings and other excessive force inflicted upon plaintiffs as specified above.  Gotthardt's and Martineau's acquiescence and support of such violence renders

them liable as if they actually committed the unwarranted violent acts.

90.         As a direct and proximate result of the constitutional violations alleged here, plaintiffs suffered varying degrees of actual physical harm as described above, and plaintiffs suffered extreme emotional harm from the demeaning and wanton treatment they received at the hands of and under the supervision of defendants Brown, Gotthardt, LaVerge, Martineau, Riley, Uber and Williams.

Count III
(unconstitutional disciplinary proceedings against Pendleton, Scurry and O'Mara
in their individual capacities  - due process)

91.         Plaintiffs incorporate paragraphs 1 through 90 as though stated here.

92.         As pretrial detainees, plaintiffs are properly subject to administrative restrictions for violating reasonable jail rules.  However, plaintiffs are entitled to certain due process rights prior to imposing those restrictions.

93.         Plaintiffs were not afforded the minimum constitutional due process rights required prior to plaintiffs' punitive confinement in Unit 2B and all the deprivations that involved.

94.         On information and belief, defendant Pendleton was responsible for the disciplinary process from the filing of charges through the hearing as to every plaintiff and, as to plaintiffs Coulombe and West, defendant Scurry also participated at that level.

95.         On information and belief, defendant O'Mara was responsible for the appeals process.

96.         As described above, plaintiffs were not shown the charges against them until the hearing commenced, some weeks after the underlying events, plaintiffs were denied the right to submit evidence at the hearing, were not given the opportunity to cross examine

their accusers, were not provided any information generated by the jail's alleged

investigation, were not provided written explanations of the guilty findings, and were

denied any meaningful appellate process.

97.        The disciplinary process was intended to cover up Rivas's false accusations, to

justify the heavy-handed moves from 2D to Unit 2B, and to hide the physical effects of

the brutal assaults on some plaintiffs.

98.        As a direct and proximate result of the unconstitutional disciplinary process,

plaintiffs were confined to Unit 2B in the first place, were confined to Unit 2B for an

unreasonable length of time, and were subjected to the inhumane and punitive conditions

in Unit 2B as described above.

Count IV
(unconstitutional conditions of Unit 2B against O'Mara as Superintendent of the
Hillsborough County Department of Corrections - due process and 8th Amendment)

99.        Plaintiffs incorporate paragraphs 1 through 98 as though stated here.

100.       Plaintiffs have the constitutional right under the due process clause as pretrial

detainees and under the 8th Amendment as sentenced inmates to be free from conditions

of confinement that are punitive and/or inhumane.  The conditions to which all plaintiffs

were subjected as described above fall below any contemporary standard of civilization

and decency.

101.       Defendant O'Mara, as Superintendent was responsible for the policies and

practices that resulted in the conditions to which plaintiffs were subjected while in Unit

2B.

102.       Defendant O'Mara was aware of the unconstitutional conditions of confinement

plaintiffs experienced in Unit 2B and on "ad-seg" status, yet allowed those conditions to

continue.

103.        Defendant O'Mara is thus liable to plaintiffs for the harm plaintiffs suffered while

subjected to those inhumane conditions and the constitutional violations they created.

104.        As a direct and proximate result of the inhumane and punitive conditions that

existed at Unit 2B, plaintiffs suffered physical and emotional damages.

Count V

(Failure and refusal to conduct classification hearings, defendants Hartley,
Raymond, Sullivan, individually, and O'Mara, in his official capacity - due process)

105.        Plaintiffs incorporate paragraphs 1 through 104 as though stated here.

106.        Plaintiffs, as pretrial detainees, were constitutionally protected from punitive

conditions of confinement.  Plaintiffs, as sentenced inmates, were constitutionally

protected from severe and atypical conditions of confinement.

107.        The conditions of Unit 2B and while on "ad-seg" status were punitive, atypical

and severe.

108.        After each plaintiff (except Champagne) served his 30 day sentence, he was

entitled to review to determine whether and when he could leave Unit 2B and return to

general population and the accompanying vast improvement in living conditions.

109.        Defendants Hartley, Raymond and Sullivan were responsible for conducting that

review as members of the jail's Classification Committee for each plaintiff (save

Champagne) to ensure that the punitive aspects of such confinement were not

unnecessarily imposed upon plaintiffs as pre-trial detainees, and to ensure that the

punitive aspects of such confinement did not amount to atypical and severe hardships so

as to amount to an Eighth Amendment violation for the sentenced plaintiffs.

110.        Defendants Hartley, Raymond and Sullivan either refused or knowing failed to

conduct such classification boards, or have conducted those boards in such a manner as to reaffirm and wrongfully extend the unconstitutional punishment inflicted on plaintiffs by continued confinement at Unit 2B.

111.    It was a policy of the jail not to conduct regular classification boards of those inmates on "ad seg" status, a policy of which defendants Hartley, Raymond and Sullivan and O'Mara were aware, upheld, and took insufficient if any steps to cure.

112.    Defendant O'Mara knew plaintiffs in particular had not received adequate classification hearings, yet took insufficient if any steps to cure the problem.

113.    As a direct and proximate result of defendant Hartley's, Raymond's, Sullivan's and O'Mara's actions and/or knowing inactions, all plaintiffs (except Champagne) were wrongfully exposed to the punitive environment at Unit 2B for an extended and unjustified period of time.


114.    PLAINTIFFS RESPECTFULLY DEMAND A TRIAL BY JURY.


WHEREFORE, plaintiffs Nicholas Champagne, David Coulombe, Palacio Paladin and Richard West, respectfully request:

a.    a declaration that the hearing and appeals process as described above violates due process;

b.    a declaration that the conditions of confinement plaintiffs experienced while designated Unit 2B and "ad seg" violate due process and/or the Eighth Amendment;

c.    a declaration that the classification review process as described above violates

due process and/or the Eighth Amendment;

d.          an award of compensatory damages against individual defendants Rivas, Brown, Gotthardt, Hartley, LaVerge, Martineau, O'Mara, Pendleton, Raymond, Riley, Scurry, Sullivan, Uber, and Williams in an amount subject to proof;

e.          an award of punitive damages from individual defendants Rivas, Brown, Gotthardt, Hartley, LaVerge, Martineau, O'Mara, Pendleton, Raymond, Riley, Scurry, Sullivan, Uber, and Williams in an amount subject to proof;

f.          an award of compensatory damages against official defendant O'Mara in an amount subject to proof;

g.          an award of punitive damages against official defendant O'Mara in an amount subject to proof;

h.          An award of attorney's fees and costs pursuant to 42 U.S.C. §1988, and pre- and post-judgment interest as allowed by law, against all defendants.


Respectfully submitted,
Nicholas Champagne, et al.,
By their attorney


/s/ Michael J. Sheehan
Michael J. Sheehan, Esq. #6590
msheehan@usa.net
58 Pleasant Street
Concord, NH 03301
(603) 225-5240