UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Palacio Paladin and Richard West,
    Plaintiffs

    v.                                 Civil No. 05-cv-079-SM
                                        Opinion No. 2007 DNH 122
Cesar Rivas, Theresa Pendleton, and
James O'Mara, Jr., Superintendent,
Hillsborough County Department of
Corrections,
    Defendants

**O R D E R**

This case is the third to go to trial on claims arising from an incident that occurred on July 14, 2002, at the Hillsborough County House of Corrections. See Suprenant v. Rivas, et al., 424 F.3d 5 (1st Cir. 2005); King v. Rivas, et al., No. 04-cv-356-SM, D.N.H. Like the plaintiffs in those earlier cases, the plaintiffs here, Palacio Paladin and Richard West, were also pretrial detainees at the county jail, and were among a group of nine inmates accused of rushing or cornering a correctional officer, they say falsely. They, too, brought suit against the accusing correctional officer, Cesar Rivas, a disciplinary officer, Theresa Pendleton, and the superintendent of the jail, James O'Mara, Jr., in his official capacity.[1]

---

[1] Since O'Mara was sued in his official capacity only, the claim is deemed to be one against the governmental entity, here

Plaintiffs claimed, respectively, that the correctional officer falsely accused them of rushing and threatening him as part of a group intending to take him hostage; that the disciplinary officer who was assigned to investigate and adjudicate the matter and who subsequently imposed administrative discipline on them, was unconstitutionally unfair and biased; and that the superintendent (the county) subjected them to unconstitutional conditions of confinement.  The case was tried to a jury.  Verdicts were returned in favor of the defendant correctional officer, but against the disciplinary officer and the superintendent.  The jury awarded Paladin and West $1.00 each in nominal damages, and $50,000 each in punitive damages against the disciplinary officer, and awarded Paladin $50,000 in compensatory damages and West $1.00 in nominal damages against the superintendent.

Defendants Pendleton and O'Mara move for judgment as a matter of law, remittitur, or, alternatively, a new trial. Plaintiffs object, and move for an award of attorney's fees. 42 U.S.C. § 1988.

---

Hillsborough County.  <u>Wood v. Hancock County Sheriff's Dep't</u>, 354 F.3d 57, 58 n.1 (1st Cir. 2003); <u>Nereida-Gonzalez v. Tirado-Delgado</u>, 990 F.2d 701, 705 (1st Cir. 1993).

**Background**

The evidence presented at trial, taken in the light most favorable to the verdict, see Correa v. Hosp. San Francisco, 69 F.3d 1184, 1188 (1st Cir. 1995), would permit a rational jury to find the following factual circumstances.

On the evening of July 14, Cesar Rivas, a relatively new corrections officer, was alone on duty in Unit 2D, a medium security pod within the county jail.  During a period when half of the roughly 100 inmates housed in the Unit were allowed out of their cells (to shower, exercise, watch television, make phone calls, etc.), Rivas radioed an alarm — known as a "10-33" call — designed to summon quick assistance from a trained stand-by team of officers.  The Unit was promptly locked down, with all inmates confined to their cells.  Rivas claimed that he had been rushed or cornered by a large group of twenty or more inmates apparently intent upon doing him harm.  He identified nine inmates as being among those who cornered him, including plaintiffs in this case, Palacio Paladin and Richard West.  The inmates Rivas identified were "lugged," or taken from Unit 2D to Unit 2B, a restricted isolation wing known among inmates as "the hole."

Plaintiffs denied to correctional officials that the incident ever happened as Rivas described it.  West said he was on his way to the shower and, seeing Officer Rivas, engaged him in a normal conversational tone in an effort to resolve what he perceived to be friction between them.  Inexplicably to West, Rivas immediately made the "10-33" call and declared a lock down on Unit 2D.  Paladin said that he was not even in the area, but was outside in the exercise yard, playing basketball with other inmates.

The nine inmates were all held in the segregation unit under identical or virtually identical conditions.  The evidence regarding conditions experienced by plaintiffs in this case was substantially the same as that presented in Suprenant, supra, and supported the succinct description of conditions set out in that opinion:

>      Inmates in segregation cells were allowed only a
> mattress, sheet, pillow and prison uniform.  All other
> items were forbidden, even legal papers, writing
> instruments, and articles essential to personal hygiene
> (like soap and toilet paper).  Although each cell
> contained a sink and toilet, the jailers restricted
> inmates' water usage in order to prevent deliberate
> flooding.  Thus, each cell's water supply was turned
> off regardless of whether the occupant had ever been
> involved in a flooding incident.  If an inmate needed
> to flush his toilet, get a drink, or wash his hands, he
> had to ask a correctional officer to turn on the water
> momentarily.  Frequently, no correctional officer was

4

nearby and, even if one was in the vicinity, the inmate
ran the risk that the officer would choose either to
ignore his request or to dawdle in fulfilling it.

                              *   *   *

[Plaintiffs] also [were] made subject to a "three-day
rotation."  Inmates on three-day rotation were allowed
out of their cells only once every three days, in
shackles, for a quick shower.  They could not make
telephone calls, receive mail, or have visitors
(although attorneys, on their own initiative, could see
their clients).  [Plaintiffs] remained . . . on a
three-day rotation for upwards of three weeks.

To make matters worse, inmates on a three-day rotation
were subjected to as many as five in-cell strip
searches each day.  The process required the inmate to
manipulate several unclean areas of his body in order
to show officers that those areas did not conceal
contraband.  The inmate then had to place his fingers
in his mouth for the same purpose.  The evidence
indicated that the strip searchers often orchestrated
these steps so that an inmate would have to manipulate
his armpits, groin, and buttocks before manipulating
his cheeks and tongue.  Because of the in-cell water
restrictions, an inmate ordinarily could not wash his
hands prior to such a search.  Not infrequently, a
strip-searched inmate would have to eat his meals with
the same unclean hands.

Suprenant, 424 F.3d at 10-11.

        In addition, the jury could have reasonably found that meals

provided to Paladin in the segregation unit were insufficient and

as a result he lost approximately 100 pounds during his stay on

Unit 2B.  (Paladin so testified and another inmate among the

nine, Nicholas Champagne, testified "half portions" were served

on Unit 2B.)  And, the evidence supported the conclusion that,

due to his large size, the shackles placed on Paladin during the
abbreviated time allowed him outside the cell, caused unnecessary
pain and injury in the form of cuts and sores.

Defendant Teresa Pendleton, a disciplinary officer in the
jail, was assigned to investigate and adjudicate violations of
jail rules and policies.  She reviewed Rivas's report and
investigated the Rivas incident.  She quickly charged plaintiffs
and the others with participating in rushing, threatening, and
attempting to take Rivas hostage.[2]

During the course of her investigation into the matter,
Pendleton was told by Inmate Suprenant, one of the nine, that he
was not at the alleged scene, but on an upper tier, lifting
weights with other inmates.  He identified witnesses who could
support his alibi, but Pendleton chose not to interview them.
Similarly, others in the identified group — David Coulombe and
Champagne — said that they were in the telephone line on the
other side of the Unit, and were not near Rivas.  Paladin told
Pendleton that he was in the outside yard playing basketball and

---

[2]  Rivas emphatically denied stating that the incident
involved threatened hostage-taking, testifying that "That came
down the road from somebody else, but I never used the word
hostage at all."  The jury could have reasonably concluded that
Pendleton added that embellishment.

was just coming inside when the lock down occurred, and
identified inmates who could corroborate his story.

From her testimony at trial it was apparent to the court,
and no doubt to the jury, that Pendleton's investigation, and her
consideration of the charges against the nine inmates identified
by Rivas, was fundamentally unfair.  She prejudged the matter,
seemingly from the outset, based solely upon Rivas's incident
report, information she allegedly obtained from a confidential
informant within the jail, and a general predisposition not to
credit inmate testimony, at least not of an exculpatory nature.
She seemingly refused to accept or even consider information
inconsistent with the foregone conclusion that the named inmates
were in fact guilty of rushing, cornering and threatening Officer
Rivas, and, she assumed, attempting to take him hostage — all
very serious charges with very serious consequences.

Pendleton seemed to categorically dismiss exculpatory inmate
information from the outset as inherently unreliable, and
declined to even look into claims which, if true, would have
completely exonerated a charged inmate.  For example, she
accepted as credible one member of the group's statement that he
saw inmates near Rivas, but rejected as not credible his

7

statement that he was watching from a doorway and was not involved (Waterman).  It was not just what she said, but the tone and manner in which she testified and the attitude she displayed, that conveyed her complete disinterest in information not supportive of the charges leveled against those inmates Rivas identified.

In addition to finding that Pendleton categorically ignored information inconsistent with Rivas's version of events, the jury could also have concluded that she exaggerated, if not outright falsified, inculpatory information allegedly provided by a confidential informant.  Pendleton claimed that a cooperating inmate, John Grady, told her that at the time of the Rivas incident, he was among that group of 2D inmates still in their cells (only half the Unit is allowed out-of-cell time in any given period), and that he saw a group of inmates cornering Rivas, albeit one smaller than that Rivas had described.  But Grady testified to the contrary at trial.  He said he had not told Pendleton that he witnessed inmates surrounding or rushing Rivas.  In fact, he pointed out that he could not have seen the alleged confrontation from his cell, given its location and the physical layout of the Unit, which effectively blocked his view of the critical area — a fact not seriously contested.  Pendleton

8

also claimed that Grady told her the ringleader was known as Mex
and occupied the cell Paladin was assigned.  (Paladin was known
as "Big Mex.")  Grady's testimony was not supportive of Pendleton
on that point.  Grady also testified at trial that he saw Baker
and Champagne in line to use the telephone at the time of the
incident, and he told Pendleton that.   But Pendleton, who relied
on Grady's alleged corroboration of Rivas's version of events as
credible, did not find his exculpatory observations credible,
because she also found Champagne and Baker guilty.

    Plaintiffs contended at trial that Rivas falsely accused
them of rushing and threatening a corrections officer.  They
suggested to the jury, with some evidentiary support, that Rivas
did so deliberately in order to "clean up" a particular corner in
the Unit — that is, to punish or remove a group of inmates he
deemed troublesome.  Alternatively, it was argued, he simply
panicked when West engaged him in conversation, being
inexperienced and alone on the Unit, and, having made a baseless
"10-33" call, Rivas fabricated a justification — the story of a
large group of inmates rushing and threatening him, conveniently
naming inmates whom he disliked, to cover up his panicked action.
They also claimed Pendleton deprived them of their right to an
impartial hearings officer before discipline was imposed, and

that O'Mara imposed unconstitutionally harsh conditions of
confinement.

## Sufficiency of the Evidence

Conditions of Confinement

Defendant O'Mara challenges the verdicts against the county
on grounds that the conditions on Unit 2B, "the hole," did not
fall below constitutional standards, at least not for a
sufficient duration to rise to the level of a constitutional
deprivation.  The court disagrees.

Viewing the facts in the light most favorable to the
verdict, as must be done, I find that the evidence presented
supported the jury's verdict against O'Mara.  The jury could have
reasonably concluded that plaintiffs were confined under
conditions that were so extreme, egregious and physically harsh
as to fall below the minimum standards of civilized decency and
thereby shock the conscience, and conditions that were not
reasonably related to a legitimate penalogical purpose.
Plaintiffs were subjected to a "three-day rotation" policy for
more than three weeks during which they were left in small cells,
in isolation, for twenty-four hours a day save for a five minute
release period every third day (at varying times, including in

10

the middle of the night) to take an abbreviated shower, while
handcuffed and shackled; that the jail administration withheld
all hygienic products and allowed limited access to water in
their cells, including water necessary to flush toilets, except
at the discretion of correctional officers, which often was
withheld for extended periods; and that plaintiffs were subjected
during that time to multiple daily strip searches (even though
they, and the other inmates on the block, had been allowed
outside their cells only rarely and then only under extremely
close supervision, while shackled, since the prior strip
searches).  Depending on the officers conducting the searches,
they were also required to place unwashed fingers into their
mouths after first exposing genital and anal areas for
inspection.  Additionally, the jury could have reasonably
concluded that plaintiffs were denied exercise, reading
materials, writing material, and all other external means to
occupy their time while in solitary confinement.  Finally, the
evidence supported the conclusion that Paladin was provided with
inadequate nutrition and lost over one hundred pounds, and
suffered unnecessary pain, cuts, and sores from the use of
handcuffs and shackles too small for his large frame.

Pretrial detainees, like these defendants, are protected from unconstitutional conditions of confinement by the Fourteenth Amendment, which operates to protect their liberty interest to the same extent as the Eighth Amendment prohibits the imposition of cruel and unusual punishment.  <u>Suprenant</u>, 424 F.3d at 18 (citing <u>Burrell v. Hampshire County</u>, 307 F.3d 1, 7 (1st Cir. 2002)).

As the court of appeals pointed out in <u>Suprenant</u>, "[t]he case law as to whether any one of these conditions by itself, might be serious enough to work a constitutional violation is in some disarray."  <u>Id.</u> at 20 (citations omitted).  Some courts have found one or more conditions described above violative of the Eighth Amendment, while others have found similar conditions to fall short of a violation.  But here the conditions "are present in combination," <u>id.</u>, and given the duration that plaintiffs were subjected to the combination of these conditions, the jury's verdict finding those conditions to be constitutionally offensive is legally sustainable.  The "three day rotation" conditions were alleviated in very minor ways after three weeks or so, but plaintiffs remained in "the hole" under substantially similar conditions, with less than one hour per day outside their cells — for several more months.

Similarly, the evidence supported the jury's finding that the unconstitutional conditions were imposed pursuant to a recognized prison policy, custom, or practice.  The Chief of Security for the jail, Captain Dionne, conceded that the "three-day rotation" conditions were imposed pursuant to a policy and practice in existence for years before July of 2002, one developed and implemented by him.  Senior correctional officers were well aware of the policy, and supervised its implementation, including all of the deprivations described.  The evidence of record supported the jury's conclusion that the jail's administrators implemented the recited conditions pursuant to an official policy, custom, or practice, knowing full well the nature of the impositions and the obvious risks to health and safety posed thereby.

"[I]n situations in which the allegation is that the policy at issue itself violates or directs public officers to violate the Constitution, proof of the existence of the policy 'necessarily establishes that the [county] acted culpably.'" Suprenant, 424 F.3d, at 19 n.6 (citing Bd. of County Comm'rs v. Brown, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed. 2d 626 (1997)).  This is such a case.  The policy governing conditions on Unit 2B, particularly with regard to the three-day rotation,

13

was in place for years, the Chief of Security was responsible for
it, implemented it, and it was well known to policymakers, like
O'Mara, who had actual knowledge of it yet did not modify it.

The evidence was sufficient to support the jury's findings
against O'Mara (the county).

Disciplinary Officer Pendleton

Defendant Pendleton also challenges the sufficiency of the
evidence to support the verdicts against her.[3]  But, again,
considering the evidence in a light favorable to the verdicts, I
find it was sufficient to permit a reasonable jury to conclude
that Pendleton violated plaintiffs' Fourteenth Amendment rights
to due process, specifically their right to an impartial hearings
officer.

Pendleton both investigated and adjudicated the charges she
brought against those inmates identified by Rivas as having been

---

[3]  Pendleton also argues that because the jury returned a
verdict in favor of Officer Rivas, Pendleton is somehow entitled
to judgment as a matter of law.  The jury may have found that
Rivas did not lie, or, he lied but not to inflict punishment.  In
any event, Pendleton's liability is premised on her breach of an
independent duty to be a fair and impartial decisionmaker,
without regard to whether an inmate is guilty or not guilty of a
charged infraction.  Even a guilty inmate is entitled to due
process, which includes an impartial decisionmaker.

in the large group that supposedly cornered and threatened him.
From the evidence presented, the jury could reasonably have found
that with respect to her investigation as a whole, and her
adjudication of the charges against each inmate accused of being
in the group, including plaintiffs here, Pendleton prejudged all
of their cases.  She accepted Rivas's report as unfailingly true,
and adopted an attitude rooted in prejudice that precluded
consideration of any exculpatory information that she might
discover or that might be presented to her.

Although Pendleton's conduct in one discrete inmate's case
is not dispositive of her conduct in others, her overall approach
to the Rivas incident was undoubtedly reflected in her approach
to each individual's case among the charged nine.  The jury could
find on the evidence presented that Pendleton's overall bias and
prejudgment extended necessarily and inevitably to each separate
case.  When Paladin told her he was not in the Unit proper at the
time, but was outside playing basketball with other inmates, who
could corroborate that fact, his explanation fell on deaf ears
and a closed mind.  His defense was presented to a disinterested
hearings officer who had no intention of seriously considering
his explanation or questioning potential inmates with relevant

information.  His case, along with the others, had already been prejudged by Pendleton based on Rivas's report.

Similarly, West, while conceding he engaged Rivas in conversation, downplayed the "confrontation" and explained that Rivas called the "10-33" without a legitimate basis — that there was no large group of threatening inmates, and no cause for him to have initiated the alarm and its serious consequences.  True, Pendleton was not required to accept West's version of events, but on the other hand, as the adjudicator, she _was_ required to have not prejudged his guilt.  The jury could have reasonably found that whatever the weight or merit of West's defense, the process was a complete sham in that Pendleton had already prejudged the guilt of every inmate charged in the Rivas incident, including West.

Worse, still, the evidence plausibly established that Pendleton at the least exaggerated, and may well have fabricated, inculpatory evidence allegedly provided by a confidential informant, an inmate named John Grady, while at the same time ignoring exculpatory information provided by him.  Pendleton claimed that Grady told her, during her investigation, that he saw a group of inmates cornering Rivas, substantially as Rivas

claimed.  But Grady was locked in his cell at the time, and it was not seriously disputed that Grady could not have seen the area where the incident allegedly occurred.  Moreover, Grady testified at trial not only that he never saw the incident, given the physical layout of the Unit, but also that he never told Pendleton that he did.  Grady said the first time he saw Rivas, Rivas was walking, at a good pace, toward the control console. The jury was free to accept Grady's testimony, and conclude that Pendleton exaggerated or fabricated the inculpatory information.

The jury likely also noted that Grady, whom Pendleton said she found credible, testified that he told Pendleton that Baker and Champagne were in line for the telephone at the time of the incident.  Pendleton did not credit those exculpatory statements and found Baker and Champagne guilty as well.  The jury could have rationally concluded from this evidence as well that Pendleton was simply blind to any information inconsistent with each member of the accused group's guilt, as charged by Rivas.

The jury was also free to assess Pendleton's demeanor, tone, and manner while testifying, and likely concluded, as the court did, that she exhibited a firm hostility to the notion that inmates could provide credible information related to a

17

disciplinary matter, and a decided aversion to following up on, much less considering, information that might prove helpful to any inmate charged in this incident, whether it was interviewing Suprenant's witnesses, or checking Paladin's alibis, or considering West's benign explanation of his involvement, or verifying Coulombe's or Champagne's telephone-line alibis or acknowledging Grady's corroboration, or considering Baker's telephone record.  (Inmate Baker, one of the nine charged, claimed that telephone records would demonstrate that he was on the telephone when Rivas called the "10-33."  A record did show that he was on the telephone at approximately the same time as the incident but Pendleton dismissed its relevance on grounds that it showed a two minute period during which Baker could have left the phone and joined the group already supposedly rushing Rivas.)

The jury plainly did not overlook either the evidence of bias and partiality on her part, or Pendleton's failure to acknowledge the rudiments of fair consideration when it came to this incident and the nine charged inmates, including these plaintiffs.

The "essence of a fair hearing is an impartial decisionmaker," Suprenant, 424 F.3d at 16 (citing Wolf v. McDonald, 418 U.S. 539, 570-71 (1974)), and plaintiffs were constitutionally entitled to due process associated with their disciplinary hearings in the form of a fair hearing and an impartial decisionmaker.  The evidence, described above, was sufficient to permit a rational jury to find that, whatever the actual merits of plaintiffs' defenses to the disciplinary charge, Pendleton was hardly an impartial decisionmaker.

As noted in Suprenant, and pertinent here as well:  "we think it self-evident that any reasonable officer in Pendleton's position would have understood that prejudging alibi witnesses without even interviewing them or hearing their testimony . . . constitute[s] a course of action inconsistent with the proper role of an impartial adjudicator."  Id. at 18 (citations omitted).

The evidence, viewed in the light most favorable to the verdicts, is sufficient to support the jury's conclusions.

<u>The Heck v. Humphrey Favorable Termination Rule</u>

Next, Pendleton asserts that she is entitled to judgment as a matter of law on grounds that plaintiffs' section 1983 claims are barred by <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), as augmented by <u>Edwards v. Balisok</u>, 520 U.S. 641 (1997).  In support of that position, Pendleton says:

> First, <u>Edwards</u> makes clear that an inmate cannot make a successful claim of unconstitutional bias of a disciplinary officer without demonstrating that the results of the disciplinary proceeding were wrong. Second, <u>Edwards</u> also shows that a constitutional claim relating to a faulty disciplinary proceeding in a correctional setting is not cognizable under 42 U.S.C. § 1983.

Defendants' memorandum of law (document no. 62-2) at 8.  The court disagrees.

Pendleton's reliance on <u>Humphrey</u> and <u>Edwards</u> is misplaced. In <u>Humphrey</u>, the Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a <u>conviction or sentence</u> invalid, a § 1983 plaintiff must prove that the <u>conviction or sentence</u> has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus.

20

<u>Humphrey</u>, 512 U.S. at 486–87 (footnote omitted)(emphasis
supplied).[4]

More recently, in <u>Edwards</u>, the Court reversed a decision in
which the Court of Appeals for the Ninth Circuit concluded that
"a claim challenging only the procedures employed in a
disciplinary hearing is <u>always</u> cognizable under § 1983."
<u>Edwards</u>, 520 U.S. at 645 (emphasis supplied).  The Court
disagreed and recognized that because some § 1983 claims, if
successful, might call into question the validity of the inmate's
criminal conviction or the duration of his criminal sentence,
such claims were more properly pursued in the context of a
petition for habeas corpus relief.

The <u>Edwards</u> Court recognized that because the plaintiff
claimed that he was unconstitutionally deprived of good-time
credits as a result of a tainted disciplinary process, if he were

---

[4]     Parenthetically, the court notes that the opinion in
<u>Humphrey</u> is plainly directed at plaintiffs who were, when the
events at issue occurred, convicted and sentenced to a term of
imprisonment.  In this case, of course, plaintiffs were neither
convicted nor sentenced when the events at issue occurred.  They
were pre-trial detainees.  Consequently, there is no underlying
court "judgment" or "sentence" that would be called into question
by a determination that, in conducting their administrative
disciplinary hearings, Pendleton deprived plaintiffs of due
process.

to prevail on his claim it would necessarily imply that the
denial of those credits was improper.  And, because the
restoration of those credits would affect the <u>duration</u> of the
plaintiff's incarceration, the Court concluded that, rather than
pursue a claim under § 1983, the plaintiff was required to file a
petition seeking habeas corpus relief.  So, like <u>Humphrey</u>,
<u>Edwards</u> stands for the proposition that, if an inmate's
successful claim would call into question the validity of his
conviction or the duration of his sentence, he must pursue that
claim in the context of a habeas petition.

    <u>Humphrey</u> and <u>Edwards</u> simply make clear that, in those
somewhat rare instances in which an inmate might seek either
monetary damages under § 1983 or obtain habeas relief, he must
first obtain habeas relief.  As the Court of Appeals for the
Third Circuit has observed:

> There is only a narrow subset of actions that arguably
> might properly be brought as either [a habeas petition
> or claim under § 1983], that is, where the deprivation
> of rights is such that it necessarily impacts the fact
> or length of detention.  In a series of decisions, the
> Supreme Court has made it clear that for those cases,
> the narrower remedy, the habeas petition, is the only
> available avenue of relief.  [<u>Edwards</u>] was one of these
> decisions.  In it, the Court clarified that a plaintiff
> cannot circumvent the overlap between habeas and § 1983
> by raising an issue as an attack upon procedure rather
> than substance, when resolution of the issue in his

favor would necessarily imply the invalidity of the sentence – the fact or duration of detention.

Leamer v. Fauver, 288 F.3d 532, 540 (3d Cir. 2002)(footnote omitted).

In any event, while there was disagreement among the circuits on this issue, the Supreme Court resolved it in 2004. In Muhammad v. Close, 540 U.S. 749 (2004) the Court held that the Heck v. Humphrey requirement did not apply to prisoner suits brought under § 1983 which did not seek a judgment at odds with a prisoner's conviction or with the state's calculation of time to be served in accordance with the underlying sentence.  In a footnote, the Court also made it clear that the requirement applies to sentences imposed pursuant to a criminal conviction, not disciplinary sanctions:

> The assumption is that the incarceration that matters under Heck is the incarceration ordered by the original judgment of conviction, not special disciplinary confinement for infraction of prison rules.  This Court has never followed the speculation in Preiser v. Rodriquez, 411 U.S. 475, 499, 93 S.Ct. 1827, 36 L.Ed. 2d 439 (1973), that such a prisoner subject to "additional and unconstitutional restraint" might have a habeas claim independent of § 1983, and the contention is not raised by the State here.

Muhammad, 540 U.S. at 751 n.1.  See also Peralta v. Vasquez, 467 F.3d 98, 104 (2d Cir. 2006) (noting that Heck's "favorable

termination requirement is <u>not</u> intended to compel a prisoner to demonstrate that a sanction he seeks to challenge, or the procedure that led to it, has been invalidated before he can proceed under § 1983 when that sanction does not affect his term of confinement") (emphasis in original).

Because plaintiffs' claims against Pendleton did not question the fact of conviction (they were pretrial detainees) or the duration of an underlying criminal sentence, those claims were properly brought pursuant to § 1983, they were not barred by <u>Edwards</u>, and plaintiffs were not required to pursue relief by way of petitions for habeas corpus.

## Remittitur and Inconsistent Verdicts

<u>Compensatory Damages</u>

Defendant O'Mara seeks an order of remittitur, reducing the compensatory damage award to Paladin from $50,000 to "a nominal amount of $1.00 or, in the alternative, to an amount better reflective of the limited evidence of actual injury."  The court declines to do so.

Defendant argues that Paladin offered "no evidence of economic damage," "no actual evidence of emotional distress," and

"no testimony that he was in any way harmed by the conditions" imposed in Unit 2B.  He also points to the fact that West, who suffered the very same conditions, was only awarded nominal damages, which defendant interprets as the jury's having concluded that no compensatory damages were warranted, but, wishing to impose a punitive damages award, it acted inconsistently with the court's instructions (that punitive damages do not lie against the governmental defendant) and awarded $50,000 in punitive damages under the rubric of "compensatory."  The court disagrees.  Juries, by and large, faithfully follow the instructions on the law provided by the court, and are presumed to do so.  Nothing in the verdicts suggests otherwise.

First, to the extent the compensatory damages awards might appear to be inconsistent, it is the court's duty to see if the seeming inconsistency can be reconciled.  See Cantellops v. Alvaro-Chapel, 234 F.3d 741, 744 (1st Cir. 2000).  ("A duty of a trial court faced with an argument that a verdict is inconsistent is to see if the seeming inconsistencies can be reconciled.").  Awarding $50,000 in compensatory damages to Paladin but only $1.00 to West, when each prevailed on his claim, and each

suffered virtually identical deprivations does seem curious on
the surface.  But the claimed inconsistency can be reconciled.

First, Paladin was a sympathetic plaintiff who testified
persuasively about the suffering he endured, the toll it took on
him, both physically and psychologically, and the enduring
effects he suffered from the unconstitutional conditions to which
he was exposed.  West, on the other hand, was far a less
sympathetic plaintiff on a personal level.  West's testimony,
demeanor, and attitude while testifying was somewhat
confrontational, even hostile at times.  The jury could well have
found that his apparent tough-guy stoicism, and obvious anti-
social background and prior criminal experience, all added up to
his not having suffered to the same degree as Paladin, or at
least not to a degree warranting, in the jury's view, a
compensatory award more generous than the $1.00 acknowledgment
that his rights were violated.

Under the circumstances, the $50,000 compensatory award to
Paladin was fully justified by the combination of conditions
imposed on him and the period of time he endured them.  The jury
was quite capable of assessing that suffering and valuing it in
economic terms.  The amount awarded was reasonable, appropriate,

fair, and just.  It did not exceed "any rational appraisal or
estimate of the damages that could be based upon the evidence
before [it]."  Kolb v. Goldring, Inc., 694 F.2d 869, 871 (1st
Cir. 1982) (quoting Glazer v. Glazer, 374 F.2d 390, 413 (5th Cir.
1967).  And, I do not find the award to be so "grossly excessive,
inordinate, shocking to the conscience of the court, or so high
that it would be a denial of justice to permit it to stand."
Davignon v. Clemmey, 322 F.3d 1, 11–12 (1st Cir. 2003).  The
award is generous, perhaps, given that juries tend not to be
indulgent in these types of cases, but it is certainly within the
realm of reasonable damages for the conditions suffered.
Accordingly, I decline to reduce it.

     The disparity in awards, or, more precisely, the nominal
award to West, would ordinarily cause the court concern — concern
that the jury denied West compensatory damages to which he was
legally entitled.  See e.g., King v. Rivas, 2006 DNH 103
(September 8, 2006) (granting King new trial on damages with
respect to this same incident when first jury awarded only
nominal damages in the face of proven compensable injury.).  And,
upon appropriate motion by West, the court would seriously
consider granting West a new trial on damages.  But West has
affirmatively waived his claim to a new trial on damages on that

ground.  <u>See</u> Plaintiff's Obj. to Mot. for Remittitur, (document
no. 65) ("West arguably has cause to file a motion for new trial
on damages similar to that granted in <u>King v. Rivas</u>.  For
tactical reasons, West opted not to do so.").

The problem with the compensatory damages verdict is not
that Paladin was awarded too much, but that West was awarded too
little.  That problem could be resolved by trying West's damages
case again, but he chose not to invoke that option, which was
entirely his choice to make.  West's choice, however, does not
undermine Paladin's entitlement to compensatory damages, or the
amount awarded Paladin.

<u>Punitive Damages</u>

Pendleton also seeks an order of remittitur with regard to
the $50,000 punitive damages awards entered against her in favor
of both Paladin and West, respectively.  Defendant doesn't make a
vigorous argument, but merely says in passing that even if the
evidence was sufficient to find that Pendleton deprived
plaintiffs of their due process right to a fair and impartial
decisionmaker, still, that evidence "does not rise to the level
of demonstrating any need to punish" her.  The court disagrees.

28

The nominal damages award of $1.00 on each plaintiff's due process claim can be plausibly explained.  The jury might well have thought that, while Pendleton's performance as a fair and impartial hearings officer was dismal and offensive to the fundamental guarantees of fairness mandated by the constitution, still, it would be somewhat speculative to conclude that Paladin and West (who conceded engaging Rivas) were in fact not guilty of the charged conduct.  A fair and impartial hearings officer might have come to the same conclusion as Pendleton on the merits.  The jury may have thought that the truth with respect to the alleged cornering of Rivas lay a long way from either the version presented by Rivas or those given by West or Paladin.  If the jury was not persuaded that either plaintiffs' or Rivas's stories were correct, but was persuaded that the adjudication process was offensively flawed, the nominal compensatory and significant punitive damages awards are understandable.

Given the evidence presented, the jury could sustainably find that Pendleton's prejudgment, her seeming categorical bias against inmate witnesses, and her aversion to following up on, or considering, exculpatory information regarding those charged in the Rivas matter, including plaintiffs, amounted to reckless disregard of, and a complete indifference toward, the plaintiffs'

important rights to due process.  Under the circumstances, it is
not difficult to understand the jury's desire in this case to
send a strong, clear, and effective message to defendant, and
particularly others similarly situated, that the right to a fair
and impartial adjudication, particularly in matters of
consequence, like this, is a serious right that cannot be lightly
tossed aside by jail officials.

The award is adequate to that purpose and is not excessive.
Reducing the award would undermine the jury's purpose in making
it, and would merely encourage like objectionable conduct in the
future by hearings officers in the Hillsborough County House of
Corrections, and other jails.  The court is disinclined to do so,
given the plain need for serious self-assessment and reform of
institutional operations at the Hillsborough County House of
Corrections, a point on which the jury plainly agreed, as
evidenced by their award.

### Attorney's Fees

Invoking the provisions of 42 U.S.C. § 1988 and their status
as prevailing parties as to two of the three counts that went to
the jury, plaintiffs seek an award of costs and reasonable
attorney's fees.

In this circuit, the preferred method of calculating fee awards is the "lodestar method," by which "the number of hours reasonably expended on the litigation [are] multiplied by a reasonable hourly rate." Coutin v. Young & Rubicam Puerto Rico, Inc., 124 F.3d 331, 337 (1st Cir. 1997)(quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).  See also In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litigation, 56 F.3d 295, 305 (1st Cir. 1995).  Plaintiffs are also entitled to an award of reasonable attorney's fees incurred in the preparation of the fee application, and any supplemental applications.  Brewster v. Dukakis, 3 F.3d 488, 494 (1st Cir. 1993).  Of course, whether a request for attorney's fees is reasonable depends, in part, upon the degree of success obtained. Urban v. Jefferson Cty. Sch. Dist., 89 F.3d 720, 729 (10th Cir. 1996) (citing Hensley, 461 U.S. at 436).

Plaintiffs bear the burden of providing sufficiently detailed contemporaneous records of the time their attorney spent and tasks he performed to allow the court to determine their reasonableness.  See Tennessee Gas Pipeline Co. v. 104 Acres of Land, 32 F.3d 632, 634 (1st Cir. 1994).  They have met that burden by submitting records detailing the effort expended by

31

counsel, as well counsel's affidavit in support of plaintiffs'
petition for costs and attorneys' fees.

Having reviewed plaintiffs' submissions and defendants'
objection, the court concludes that the hourly rates charged by
Attorney Sheehan are reasonable and entirely consistent with
those customarily charged by practitioners of comparable skill
and expertise in this area.  See Andrade v. Jamestown Housing
Auth., 82 F.3d 1179, 1190 (1st Cir. 1996) ("In determining a
reasonable hourly rate, the Supreme Court has recommended that
courts use 'the prevailing market rates in the relevant
community' as the starting point.").  The court also concludes
that the fees charged, as well as the number of hours worked by
Attorney Sheehan, are reasonable and appropriate in light of the
complexity of this case, the qualifications of counsel, the
volume of work performed by counsel, the substantial economic
risk he assumed in taking this case, and the ultimate resolution
of this matter.  See generally Hensley, 461 U.S. at 448–49.

Attorney Sheehan is notable in the bar of this district for
his expertise in handling prisoner Section 1983 litigation, and
for his willingness to take on such cases, which involve a
substantial economic risk to him.  Prisoners as a rule cannot pay

legal fees, so, absent success on the merits, Attorney Sheehan
risks expending a substantial amount of time, effort, and money
in cases like this, without compensation or recovery.  And, the
time he devotes to cases like this one is time diverted from
other paying work.  The fee shifting provision is designed to
encourage counsel like Attorney Sheehan to take such cases to
insure that protected rights are vindicated, even for the most
powerless in society.  His success in this case, and the reform
it may engender, warrant the full fee requested.

Finally, the court concludes that because the legal work
associated with the two claims on which plaintiffs prevailed at
trial was sufficiently intertwined with work on their one
unsuccessful claim, there is no need to discount counsel's fees
simply because plaintiffs were not successful on all claims.
See, e.g., Lipsett v. Blanco, 975 F.2d 934, 940 (1st Cir. 1992)
(holding that because "work done on these unsuccessful claims was
sufficiently interconnected with the causes of action upon which
appellee prevailed, we refuse to grant the requested
reductions.").  See also Hensley, 461 U.S. at 435 (observing that
counsel's fees should not be reduced when claims as to which
plaintiffs prevailed overlapped substantially with those on which

33

they were not successful, nor should they be reduced when counsel obtained "excellent results" for his or her client).

Here, there can be little doubt that Attorney Sheehan obtained excellent results for his clients.  Additionally, evidence gathered and legal work performed in an effort to prove that Officer Rivas lied overlapped substantially with that aimed at proving Pendleton deprived plaintiffs of due process.  For example, evidence demonstrating that some of the nine accused inmates actually had credible alibis not only supported plaintiffs' claims that Rivas lied about the incident, but also supported the claim that Pendleton failed in her duty of impartiality.

### Conclusion

Defendants' motion for judgment as a matter of law (or new trial) (document no. 62) and their motion for remittitur of damages (document no. 63) are denied.  For the foregoing reasons, as well as those set forth in plaintiffs' memorandum and their reply to defendants' objection (document no. 73), their motion for attorney's fees and costs (document no. 66) is granted. Plaintiffs are awarded $33,952.50 in attorney's fees

(representing 150.9 hours of compensable time at $225 per hour), and an additional $1,247.32 in costs.

       **SO ORDERED.**

                      _____
                      Steven J. McAuliffe
                      Chief Judge

September 28, 2007

cc:  Michael J. Sheehan, Esq.
     John A. Curran, Esq.
     Elizabeth L. Hurley, Esq.